# 14-2809-cr(L),
## 14-2832-cr(CON), 14-2873-cr(CON)

# United States Court of Appeals
## for the
# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

MICHAEL BINDAY, aka Sealed Defendant 1, JAMES KEVIN KERGIL,
aka Sealed Defendant 2, MARK RESNICK, aka Sealed Defendant 3,

*Defendants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT
## MICHAEL BINDAY

ZUCKERMAN SPAEDER LLP
*Attorneys for Defendant-Appellant*
  *Michael Binday, aka Sealed Defendant 1*
1185 Avenue of the Americas
New York, New York 10036
(212) 704-9600

# **<u>TABLE OF CONTENTS</u>**

**<u>PAGE</u>**

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ....................................................1

QUESTIONS PRESENTED.................................................................1

PRELIMINARY STATEMENT ..........................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF THE CASE.............................................................3

    A.    Background ........................................................3

    B.    The Testimony of the Non-Insurance Company Witness ..................6

    C.    The Testimony of the Two Insurance Company Witnesses ..............9

    D.    The Defense Case.........................................12

ARGUMENT ....................................................................................13

POINT ONE:      THE JURY INSTRUCTION ON
                  ECONOMIC HARM MISSTATED THE LAW...................13

    A.    Indictment.....................................................13

    B.    Pre-Trial Motion Practice .................................15

    C.    Rule 29 Argument .........................................17

    D.    Charge Conference ........................................18

    E.    The Court's Charge ........................................19

    F.    Discussion .....................................................20

i

POINT TWO:     THE EVIDENCE WAS LEGALLY
INSUFFICIENT JUDGED AGAINST
A CORRECT JURY INSTRUCTION ...................................27

POINT THREE:   THE INDICTMENT WAS
CONSTRUCTIVELY AMENDED.......................................32

    A.    Background .......................................................................32

    B.    Discussion ........................................................................35

POINT FOUR:    THE PROSCUTOR'S SUMMATION
ARGUMENT PREJUDICED THE DEFENSE ...................37

POINT FIVE:     THE "LOSS AMOUNT" FOR PURPOSES OF
SENTENCING AND THE RESTITUTION
AWARD WERE WILDLY OVERSTATED........................42

CONCLUSION ......................................................................................46

ii

# TABLE OF AUTHORITIES

**PAGE**

## CASES

Grigsby v. Russell, 222 U.S. 149 (1911) ...................................................................4

Kramer v. Phoenix Life Ins. Co., 15 N.Y.3d 539 (2010) ................................... 4-5

Stirone v. United States, 361 U.S. 212 (1960)........................................................36

United States v. Aguilar, 515 U.S. 593 (1995) ........................................................2

United States v. Bruno, 661 F.3d 733 (2d Cir. 2011) ............................................27

United States v. Clemente, 22 F.3d 477 (2d Cir. 1994).........................................32

United States v. Ford, 435 F.3d 204 (2d Cir. 2006) ..............................................27

United States v. Forlorma, 94 F.3d 91 (2d Cir. 1996)......................................41, 42

United States v. Kopstein, 2014 WL 3561750 (2d Cir.) ........................................27

United States v. Lebovits, 2012 WL 10181099 (E.D.N.Y.)...................................23

United States v. Lorefice, 192 F.3d 647 (7th Cir. 1999) ................................. 29-30

United States v. Lorenzo, 534 F.3d 153 (2d Cir. 2008)........................................32

United States v. Masotto, 73 F.3d 1233 (2d Cir. 1996)........................................13

United States v. Millar, 79 F.3d 338 (2d Cir. 1996)..............................................41

United States v. Miller, 471 U.S. 130 (1985) ........................................................32

United States v. Milstein, 401 F.3d 53 (2d Cir. 2005)..............................32, 35, 36

United States v. Mittelstaedt, 31 F.3d 1208 (2d Cir. 1994)...................................21

United States v. Modica, 663 F.2d 1173 (2d Cir.1981).........................................40

United States v. Nersesian, 824 F.2d 1294 (2d Cir. 1987) ....................................41

United States v. Nkansah, 699 F.3d 743 (2d Cir. 2012)........................................31

United States v. Novak, 443 F.3d 150 (2d Cir. 2006) ...........................................21

United States v. Richter, 826 F.2d 206 (2d Cir. 1987) ..........................................37

United States v. Rigas, 490 F.3d 208 (2d Cir. 2007).............................................33

United States v. Rossomando, 144 F.3d 197 (2d Cir. 1998) ....................16, 23, 26

United States v. Salmonese, 352 F.3d 608 (2d Cir. 2003).....................................35

United States v. Shellef, 507 F.3d 82 (2d Cir. 2007)................................... passim

United States v. Suarez, 588 F.2d 352 (2d Cir. 1978) ..........................................41

United States v. Tocco, 135 F.3d 116 (2d Cir. 1998).............................................41

United States v. Wallach, 979 F.2d 912 (2d Cir. 1992).........................................27

United States v. Williams, 690 F.3d 70 (2d Cir. 2012) .........................................41

## OTHER AUTHORITIES

J. Coffee, From Tort to Crime, 19 Am. Crim. L. Rev. 117 (1981-82)....................2

L. Dean, AIDS, Viatical Settlements, and the Health Care Crisis,
    25 Rut. L. J. 117 (1993) ..................................................................................4

Insurance NewsNet, 7/7/2014 .................................................................................4

## JURISDICTIONAL STATEMENT

Michael Binday appeals from a judgment of conviction entered on July 30, 2014, in the United States District Court for the Southern District of New York (McMahon, J.).  The district court had jurisdiction under 18 U.S.C. §3231.  This Court has jurisdiction under 28 U.S.C. §1291.  This appeal was timely filed.

## QUESTIONS PRESENTED

1.    Whether the trial court's instruction on economic harm misstated the law?

2.    Whether the government failed to present sufficient evidence that Mr. Binday intended economic harm?

3.    Whether there was a constructive amendment of the indictment?

4.    Whether the prosecutor's rebuttal summation unfairly prejudiced the defense?

5.    Whether the loss amount used at sentencing was wildly inflated?

## PRELIMINARY STATEMENT

On February 15, 2012, an indictment was filed in the Southern District of New York, charging Michael Binday with (i) conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §1349; (ii) mail fraud, in violation of 18 U.S.C. §1341; (iii) wire fraud, in violation of 18 U.S.C. §1343; and

1

(iv) obstruction of justice, in violation of 18 U.S.C. §1512(c).[1]  On October 7, 2013, the jury returned its verdict, convicting Mr. Binday of the three fraud charges.  On July 30, 2014, he was sentenced principally to 12 years' imprisonment.[2]

Mr. Binday is currently at liberty, having been granted bail pending appeal by this Court.

## __INTRODUCTION__

"When in doubt, [prosecutors] charge mail fraud."  J. Coffee, From Tort to Crime, 19 Am. Crim. L. Rev. 117, 126 (1981-82).  Here, Michael Binday was charged with mail and wire fraud for his involvement in a business that arranged for the sale of life insurance policies to hedge fund investors.  Without doubt, Mr. Binday and his partners submitted applications for life insurance policies that contained falsehoods.  The question, however, is did his conduct violate the mail and wire fraud statutes?  Our brief raises five related issues:  First, did the trial court's charge on "economic harm" misstate the law by permitting the jury to convict on a "right to control" theory without a showing of intended

---

[1]     The obstruction charge was dismissed prior to trial based upon United States v. Aguilar, 515 U.S. 593 (1995).

[2]     James Kevin Kergil and Mark Resnick were charged in the three fraud counts and in a separate obstruction count.  They were convicted on all counts. Kergil was sentenced principally to 108 months' imprisonment and Resnick to 72 months' imprisonment.

economic harm?  Second, did the government fail to present sufficient evidence that Mr. Binday intended to cause economic harm?  Third, was there a constructive amendment of the indictment when the charges were broadened so that the prosecution did not have to prove the economic harms specified in the indictment?  Fourth, did the prosecutor propound a theory of economic harm in his rebuttal summation that distorted the evidence and prejudiced the defense?  And fifth was the "loss amount" that the court used at sentencing wildly overstated?  As shown below, we believe that the answer to each of those questions is "yes," and therefore that Mr. Binday's convictions cannot stand.

## STATEMENT OF THE CASE

A.  Background

This case involves the purchase of universal life insurance policies for which Michael Binday's company was the broker.  Like all life insurance products, a universal life policy provides a fixed sum to a named beneficiary on the death of the insured in return for periodic premium payments to the life insurance company.  (A-470-71, 477).[3]  With a universal life policy, however, the policy owner has the option of paying amounts above the required premium from which she can receive a return on a tax-deferred basis.  (A-471, 477).  A person seeking life insurance

---

[3]  "A" refers to the Appendix to this brief, which includes key pages from the trial record and other material; "Tr." refers to other trial record citations; and "GX" and "DX" refer to other trial exhibits.

3

generally deals with an insurance broker who receives a commission from the insurance company (from 55 to 100 percent of the first year's premium) for his services. (A-480). Significantly, under every state's laws, a policy owner can resell a policy to a third party, who then pays the premiums and can change the beneficiary. (A-571). If the policy is resold, the death benefit remains payable on the death of the insured.[4]

More particularly, this case involves stranger-owned life insurance ("STOLI") policies. A STOLI policy is one in which the original purchaser intends to resell the policy to an investor from the outset. See A-1443 ("in [a STOLI] transaction, the intent to sell the policy is made before the life insurance policy is ever issued")(emphasis in original).[5] In the years 2004 to 2009, hedge

---

[4]     See Grigsby v. Russell, 222 U.S. 149, 156 (1911)("to deny the right to sell [a life insurance policy] except to persons having [an interest in the insured's life] is to diminish appreciably the value of the contract in the owner's hands"). There is a robust secondary market for life insurance, which developed in the 1980's during the AIDS epidemic. At that time, it was common for investors to purchase policies from AIDS patients who needed money for health care. See A-669 ("there can be legitimate reasons to [sell a policy] if the policyholder has no estate needs . . . and the value offered by the [investor] is greater than the cash value of the policy"). Investors were betting that if they purchased a policy and paid the premiums for a few years, they would profit handsomely when the AIDS patient died. See L. Dean, AIDS, Viatical Settlements, and the Health Care Crisis, 25 Rut. L. J. 117 (1993). In 2013, the face value of life insurance policies sold in the secondary market reached $2.57 billion. See Insurance NewsNet, 7/7/2014.

[5]     STOLI policies are sometimes referred to as IOLI policies: investor owned life insurance policies. (A-469). In Kramer v. Phoenix Life Ins. Co., 15 N.Y.3d 539 (2010), the New York Court of Appeals held that STOLI policies issued prior

funds sought to purchase life insurance policies that they believed had been mispriced -- i.e., policies for which the insurance companies had over-estimated the insureds' life expectancy so that purchasing the policy (paying the premiums and collecting the death benefit) could prove a profitable investment.  (A-484-85).  STOLI policies came into existence to meet investor demand; typically, the policy carried a large death benefit so that if a hedge fund bet right, it stood to make a large profit.  (A-467-68).

As the jury learned, some insurance companies expressed an aversion to STOLI policies and took actions that were purportedly designed to screen them out.  (At trial, the defense argued that the actions were window dressing -- that the insurance companies "wanted to tell the world that they were opposed to STOLI, but they still wanted the [business]."  (Tr. 1456)).  For example, companies required applicants to certify that they had no intention of reselling their policies and that no third-party would be financing the premiums.  The thrust of the alleged fraud was that Mr. Binday and his partners submitted documents to life insurance companies falsely stating that the applicants had no intention of reselling their policies when that was the intention, and thereby deprived the insurance companies

---

to May 2010 did not violate New York Insurance Law.  See id. at 551 (rejecting the argument that "a policy obtained by the insured with the intent of immediate assignment to a stranger is invalid").  Effective May 2010, New York enacted legislation prohibiting STOLI.  It remains lawful, however, for an insured to sell his policy if his intent to sell is formed after he purchases it.  See supra n.1.

of money or property.  Whether the defendants intended to deprive the insurance companies of money or property was a core issue in the case.

B.    <u>The Testimony of the Non-Insurance Company Witness</u>

Much of the 11-day trial went to government witnesses whose testimony was largely uncontested.  From those witnesses, the jury learned this: Sometime in late 2005, Michael Binday, who owned an insurance agency in Scarsdale, developed a plan involving the purchase and sale of STOLI policies.  He invited several others to assist him.  (A-695)("who wants to have a Ferrari in their driveway").  Among those who joined Mr. Binday were co-defendants Kevin Kergil and Mark Resnick, as well as Edward Lynch and Paul Krupit, who testified for the government under cooperation agreements.

The heart of the plan was to identify older individuals (all were more than 70) often of modest means and have them apply for universal life insurance that carried a multi-million dollar death benefit.  For each insured who testified at trial, Mr. Binday and his partners completed financial affidavits that inflated the insured's income and assets and falsely reported that the policy was being sought for estate planning purposes -- that the application was not for a STOLI policy. Although the insureds represented that they would be paying their own premiums and had no intent to resell their policies, the opposite was true.  In each instance, Mr. Binday sought to arrange for the resale of the policy to a hedge fund or other

investor.[6]  What was <u>not</u> false was the insureds' health information; indeed, the insureds submitted to additional medical testing whenever the insurance company requested it and answered all health-related questions accurately.  (A-341-42, 404, 426-27).

A typical insured was Silas Griffin, who lived in Orlando, Florida, and was "retired military and on disability."  (A-304).  In 2007, when he was 76, Griffin contacted Mark Resnick about buying burial insurance.  Griffin was seeking only "15 to $20,000" in insurance, but Resnick made a more attractive proposal.  (A-307).  As Resnick explained it, Griffin could obtain a $4 million life insurance policy for which Griffin's wife would be the initial beneficiary.  A trust would hold the policy, and Griffin would pay no premiums for two years (the premiums would be paid for him by a third party).  (A-308).[7]  At the end of the two years, he would sell the policy and would receive $200,000 for doing so.  (<u>Id</u>.).  <u>See</u> A-1083 ("until you're bought out of your policy . . . [your wife] will be paid in the event of your death").

---

[6]    In two instances, the defendants purchased a policy themselves and obtained the death benefit when the insured died.  In both cases, the insureds died well before anyone expected, and the defendants profited on the transactions.  <u>See</u>, <u>e.g.</u>, GX 2136 (my mother's "life expectancy has go[ne] from a rough estimate of 9 yrs. to an . . . assessment of weeks").

[7]    The two-year period was commensurate with the policy's "contestability period" after which, by law, an insurance company cannot challenge a claim for benefits on the ground that the application contained misstatements.  (A-490).

7

Griffin accepted Resnick's proposal. Although Griffin's annual income was less than $100,000 and his assets less than $50,000, Mr. Binday submitted an application to Lincoln Financial in Griffin's name that showed his annual income at $225,000 and his assets at $4.8 million. (A-1084). The application also represented that Griffin had no intention of selling the policy and would be financing it himself. (Griffin had signed the application in blank, and Resnick had completed it.) Based on the application, Lincoln issued Griffin a $4 million life insurance policy at an annual premium of $251,680. (A-339). Prior to the issuance of the policy, Mr. Binday had arranged for HM Ruby Fund to finance those premiums during the first two years. (A-1094). The loan was to be repaid from the proceeds of the sale of the policy to a STOLI investor at the end of the two-year period. The plan fell apart, however, when no investor could be found to purchase the policy, and it lapsed.

The evidence also showed that the medical information submitted in connection with Griffin's application was accurate. (A-341). An insurance company doctor had visited Griffin and given him a full physical examination, and he had answered all health-related questions truthfully. (A-342). The insurance company did not ask Griffin to provide financial documentation: it did not request bank statements, a home appraisal, or stock certificates. (A-351).

8

C.     The Testimony of the Two Insurance Company Witnesses

The government called two insurance company witnesses.  The first was James Avery, the President of Prudential Insurance Company of America.  Avery testified that the STOLI market began in "2004-2005" and that the policies were issued to "seniors" and were "typically . . . large policies."  (A-466-67).  From the outset, Prudential "decided that [it] did not want to issue any policies that were being initiated or sold to strangers."  (A-483).  It believed that STOLI was illegal.  (Id.).  And it found STOLI business unattractive:

> A.     These policies, this class of policies would be owned by investors who benefited from death and didn't benefit from anything else, and so we believe that they would continue to pay premiums and that they would try to select insureds where they believe based on their evaluation that the premiums were inadequate for the death benefit eventually to be received.  They were betting against the house . . . .

(A-484-85); see id. at A-491-92 (Prudential "does not support the sale of life insurance so that the policyowner can sell it to a third party who is speculating on the premature death of the insured").  Purportedly to weed out STOLI policies, Prudential required applicants over 70 who sought to purchase more than

9

$1 million in insurance to certify that they did not intend to sell the policy if it was issued.  (A-493-94).[8]

According to Avery, Prudential did not see any "performance or different experience" between STOLI and non-STOLI policies, perhaps because it "tried as best [it] could not to sell [STOLI]."  (A-484).  Avery also gave this testimony:

> Q.    [D]oes Prudential take the position that people with a higher net worth have a lower mortality?
>
> A.    We don't take that position.

(A-546).[9]

The second insurance company witness was Michael Burns, the Senior Vice President of Product Management for Lincoln Financial.  Burns

---

[8]    In his summation, Mr. Binday's counsel mocked the insurance companies' position:

> So, the difference is in STOLI, when you sign it, [you] intend to sell it.  [T]hat the life insurance companies say, oh, that's terrible.  Bad for business, bad social policies, bad everything.  But, a minute later [you] can decide to sell it into the life settlement market and . . . that's okay. There's no social problem with that.

(Tr. 1443-44).

[9]    Avery also testified about "lapses."  A lapse "refers to when a policyholder no longer pays [the required] premium, . . . the insurance contract terminates, [and] the death benefit goes away."  (A-472-73).  Prudential expected some policies to lapse (either because the insured no longer needed the policy or could no longer afford it) and built that expectation into its pricing models.  (A-539).  If policies never lapsed, the company would have to "raise prices going forward."  (A-551).

testified that in 2005, Lincoln concluded that it, too, did not want STOLI business. For Lincoln, the decision was more about profitability than legality or general principles. (A-576)("STOLI business would impair profitability [because] our products weren't priced for STOLI"). According to Burns, STOLI policies would not lapse and would be funded "on a minimum basis," unlike non-STOLI policies for which lapses and more-than-minimum premium payments were expected. (A-577-78).[10] Burns, however, offered no data to support those beliefs.[11] Moreover, Burns testified that, in Lincoln's view, there was a correlation between an individual's financial status and mortality: "what we see . . . is that higher net worth individuals experience better overall mortality experience than the general population due to factors such as better access to healthcare." (A-586). Like

---

[10] Burns explained what he meant by a "minimum basis" this way:

> A. . . . . When we price a product, we . . . have to factor in the flow of the premiums that will come into the policy. [T]o the extent that individuals decide to pay premiums at a higher level . . . than the minimum, that provides a source of investment income that then makes its way into the underlying pricing.

(A-574-75).

[11] Nor did the government call an investor to confirm Mr. Burns' suspicions.

Prudential, Lincoln asked questions on its application that were supposedly designed to screen out STOLI policies. (A-592).[12]

On cross examination, Avery and Burns acknowledged that their companies did not request tax returns, banks statements, or brokerage statements or do routine credit checks or internet house searches, even if an applicant was more than 70 and the death benefit sought was large. (A-508-12, 636-39).[13]

D.    The Defense Case

The defense sought to show that the insurance companies suffered no economic harm and knew that the policies in question were STOLI. The contention was that the companies wanted to give the appearance of refusing STOLI business while accepting and profiting from it. Among the evidence adduced was the fact that in May 2006, AIG required that older insureds seeking high death benefit policies submit tax returns to help screen out STOLI. (DX 7). AIG, however, abandoned the measure four months later because it was reducing sales. (DX 15)(noting that "incoming volume on cases age 70+ have decreased"

---

[12]    Burns also testified that Lincoln was concerned that STOLI policies could jeopardize the favorable tax treatment that life insurance receives. (A-591).

[13]    The insurance companies did require a report from an independent inspector verifying that a search of public records had corroborated (or at least not discredited) the financial information on the insured's application. (A-725-26). The defendants enlisted Frank Pellicone and others to fill that role. Pellicone, however, merely signed off on the information that the defendants provided him without conducting any independent investigation. (A-720-21, 748, 752, 799).

12

but "field reaction has been mixed"). The defense also showed that even after Lincoln identified Mr. Binday as a suspected STOLI broker, it named him one of its "top producers," rewarded him with expensive trips, and continued to accept policies from him that had telltale STOLI features. (DXs 165, 168, 169, 237).

## ARGUMENT

### POINT ONE

### THE JURY INSTRUCTION ON ECONOMIC HARM MISSTATED THE LAW

As discussed below, the trial court gave an instruction on "economic harm" that misstated the law or, at the very least, was so confusing that no reasonable jury could understand what the government was required to prove to convict Mr. Binday of the fraud charges. See United States v. Masotto, 73 F.3d 1233, 1238 (2d Cir. 1996)("[a] jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law"). Some background is useful to put the instruction in context.

A.   The Indictment

The indictment alleged that the life insurance companies "were deceived into issuing [STOLI] universal life polic[ies] [and] were harmed in several ways." (A-164-96). Ind. ¶ 10; see also id. ¶ 4 (the Providers "were financially harmed in issuing such policies")(emphasis added); id. ¶ 9 (STOLI policies "caused a discrepancy between the benefits reasonably anticipated by the

13

Providers and the actual benefits received"). In paragraph 10, the indictment identified four specific "harm[s]." The first involved the so-called "wealth equals health" effect -- that "an individual with a net worth of millions of dollars [will] live longer than an individual with minimal net worth." Ind. ¶ 10(a). By inflating the insureds' net worth, the defendants, the indictment alleged, obtained insurance for individuals whose lives were likely to end earlier than the insurance companies expected (with a resultant loss of premium income for the companies). Id.

The second "harm" was that life insurance companies would "receive[] less income than expected from universal life policies when, unbeknownst to [them] at the time of issuance, investors and other third parties held an interest." Ind. ¶ 10(b). The allegation here was that non-STOLI policyholders would "pay premiums in amounts that exceeded the minimum necessary to sustain the policy," whereas STOLI policies "typically would be funded at or near the minimum amount necessary to sustain the policy." Id. The loss in premiums meant a loss in monies that the insurance company could invest. The third "harm" related to lapse rates: the indictment alleged that a portion of non-STOLI policies would lapse, whereas lapse rates for STOLI policies were likely to be low. A hedge fund investor intent on obtaining a death benefit would stay with the policy to the end. Thus, STOLI policies "undermined actuarial

assumptions . . . that [insurance companies] used to price their policies." Ind. ¶ 10(c).

The final "harm" involved "grace periods and other features that permitted late payments of premiums." Ind. ¶ 10(d). The notion here was much the same. STOLI policyholders would be more likely to take advantage of grace periods (and delay premium payments) than non-STOLI policyholders. As a result, premiums from STOLI polices supposedly were "received later in the payment periods than polices paid by an actual insured," to the insurance companies' detriment. Id.

B.    Pre-Trial Motion Practice

Prior to trial, Mr. Binday moved to dismiss the fraud counts on the ground that "the alleged misrepresentations were not essential to the bargain." Binday's Motion at 2-13 (relying on United States v. Shellef, 507 F.3d 82 (2d Cir. 2007)).[14] The trial court rejected that claim. It wrote this:

> Here . . . the Indictment alleges that the defendants'
> misrepresentations "caused a discrepancy between the
> benefits reasonably anticipated by the Providers and the
> actual benefit received" (Indictment ¶ 9) and then spells
> out four different ways in which the lies that the
> defendants told . . . affected the Providers' bottom line

---

[14]    Shellef is discussed infra, at 20-21; it held that to support a mail fraud conviction, the government must show more than that the defendants' misrepresentations "cause[d] their victims to enter into transactions they would otherwise avoid." 507 F.3d at 108.

> (see id. ¶10).  These allegations are precisely the types of allegations that were missing in Shellef.

A-228 (emphasis in original); see also id. at A-227 ("the indictment . . . explains

how th[e] misrepresentations actually cause the Providers economic harm").

Thereafter, as the trial date approached, the government moved in limine to "preclude evidence and argument that defendants' false representations did not cause actual economic harm."  Gov't Mem. in Support of Motion In Limine at 17-19.  The gist of the government's argument was that "evidence . . . relating to . . . how the Subject Insurers actually fared, economically, in the wake of defendants' false representations should be precluded" because actual harm is not an element of the crimes charged.  Id. at 18, citing United States v. Rossomando, 144 F.3d 197, 201 n.4 (2d Cir. 1998)("[i]t is also irrelevant . . . whether the victim of a fraudulent scheme does in fact suffer harm, so long as concrete harm was contemplated").  In response, Mr. Binday's counsel argued that the government was now seeking to constructively amend the indictment to allege a "right to control money" theory of fraud.  As the defense saw it, the government's "sudden reversal" was the result of "the mounting volume of documentary evidence . . . that demonstrates [the government] cannot prove the alleged economic harms detailed in the indictment."  Binday's Mem. in Opposition to Gov't Motion in Limine at 19.

16

After hearing argument, the court granted the government's motion to preclude and denied the defendants' motion to dismiss the indictment. The court wrote this:

> [T]he Government cannot prevail simply be establishing loss of the "right to control" the Insurers' assets . . . . That would be tantamount to proving only that the Insurers would not have issued the policies if they had known the truth of the matter. Rather, if the Government intends to rely on a "right to control" theory, <u>it must prove that the Insurers would have suffered some sort of tangible economic harm as a result of the loss of the right to control</u>. That harm need not be to the bottom line -- at least, not in the sense of suffering actual economic losses. <u>But the Government cannot prevail if it does not introduce evidence that the Insurers suffered, for example, the harms outlined at Paragraph 19 [sic] of the Indictment -- which quality as "financial harm" as pleaded in Paragraph 4</u>. I cannot see that the Government has in any way constructively amended the indictment . . . as long as it intends to prove what the Indictment specifically pleads (and the Government represents that it has plenty of evidence to prove the allegations of Paragraph 10).

A-284 (emphasis added).

C. <u>Rule 29 Argument</u>

The issue of economic harm resurfaced when the defendants moved for dismissal of the fraud charges at the end of the government's case. During the course of the argument, there was this interchange:

> THE COURT:    Since we are all fixated on the in limine motion, can I make the point that I think what I said was that it wasn't enough to show, for the

government to show that the insurance company wouldn't have entered into the transaction . . . . I didn't say it is not enough for the government to show loss of the right to control property . . . .

MR. ABRAMOWITZ: You used the word "economic harm."

THE COURT: But I think it is the law that the right to control, the loss of the right to control one's property constitutes tangible economic harm.

MR. ABRAMOWITZ: No, that is the <u>Shellef</u> case and that is what is missing here . . . . Let me quote to you what you said in the in limine motion.

THE COURT: I was really specific. <u>I said if the government can prove that the victims did not get what they bargained for, if they thought they were bargaining for universal life, and they ended up getting STOLI, which they didn't want, that would be enough.</u> That would do it.

(A-811-12)(emphasis added). The court also emphasized that the government did not "have to prove the [harms] alleged in the indictment." (A-815). On that basis, the motion to dismiss was denied.[15]

D.    <u>Charge Conference</u>

The issue of economic harm arose again at the charge conference. In reviewing a draft of the jury instructions, the court told defense counsel this:

---

[15]    Notably, the prosecution responded to the Rule 29 motion this way: "I want to remind the court this is a straightforward case because what we are alleging is that there was a scheme to defraud insurance companies of money and property, <u>deprive them of commissions, they wouldn't have paid these commissions had they known the truth, deprive them of the policies they wouldn't have issued . . . had they known the truth</u>." (A-819-20)(emphasis added).

You wanted me to say that there had to be economic harm, and there does. I said that. I haven't changed my mind about that . . . . The government is going to argue there was economic harm. <u>The government is going to argue there was economic harm because your clients received commissions</u>. The government is going to argue there was economic harm because it is going to have to pay out on policies because it is [sic] underwriting guidelines were wrong and it made incorrect assumptions. Those are all economic harms, and they're real money harms, okay?

(A-834)(emphasis added).

E.    <u>The Court's Charge</u>

The Court's charge on economic harm was this:

Now, as I told you a few minutes ago, a scheme to defraud is a course or a plan of action to deprive someone of money or property. What does that mean, deprive someone of money or property? Well, obviously a person is deprived of money or property when someone else takes his money or property away from him. <u>But a person can also be deprived of money or property when he is deprived of the ability to make an informed economic decision about what to do with his money or property</u>. We referred to that as being deprived of the right to control money or property. Because the government need only show that a scheme to defraud existed, not that it succeeded, it is not necessary for the government to prove that any insurance company actually lost money or property as a result of the scheme. Such a loss must, however, have been contemplated by the defendant. In considering whether loss was contemplated, keep in mind that the loss of the right to control money or property constitutes deprivation of money or property only when the scheme, if it were to succeed, would result in economic harm to the victim. <u>Economic harm is not limited to a loss on the company's</u>

19

<u>bottom line</u>. In order for the government to prove a scheme to defraud, it must prove that the scheme, if successful, would have created a discrepancy between what the insurance companies reasonably anticipated and what they actually received. If all the government proves is that under the scheme the insurance companies would enter into transactions that they otherwise would not have entered into, without proving that the ostensible victims would thereby have suffered some economic harm, then the government will not have met its burden of proof.

(A-889-90)(emphasis added).

F.    <u>Discussion</u>

We begin our argument, unconventionally, with a question: if the proof showed (i) that, using the mail, an insurance broker deceived insurance companies into issuing STOLI policies, which the companies did not want to issue because they believed STOLI was unseemly; (ii) that the broker earned commissions on the policies; but (iii) that the insurance companies did not lose money (<u>i.e.</u>, there was no showing that lapse rates, minimum premium payments or use of grace periods differed between STOLI and non-STOLI policyholders), would the broker be guilty of mail fraud? Did he deprive the insurance companies of "money or property by means of false or fraudulent pretenses [and] representations," which is what the mail fraud statute requires?

Under this Court's cases, the answer is clearly "no." The leading case is <u>United States v. Shellef</u>, 507 F.3d 82 (2d Cir. 2007). There, the defendants induced Allied Signal to sell virgin CFC-113, an industrial solvent, to their

20

company by falsely representing that they would resell the product only overseas. That territorial restriction was important to Allied, and the defendants evaded it. On these facts, the Court concluded that the defendants' wire fraud conviction could not stand -- that the government's "no sale theory" (that Allied would not have entered into the transaction if it had known the defendants' true intentions) was not a valid one. Id. at 109 ("[t]he jury here might have erroneously convicted [the defendants] even though it concluded [only that they] made simpl[e] fraudulent inducements to gain access to Allied['s] products").

Other cases in this Circuit are to the same effect. See United States v. Novak, 443 F.3d 150, 157 (2d Cir. 2006)(rejecting government's argument that a conviction under the mail fraud statute is established merely because "the victims would not have entered into the transaction had they known of the deception"); United States v. Mittelstaedt, 31 F.3d 1208, 1217 (2d Cir. 1994)(rejecting the government's argument that "the loss of the 'right to control' the expenditure of . . . funds, through the loss of the ability to make a fully informed decision, is sufficient to constitute mail fraud"). Simply stated, it is not enough that a party to a contract was affected because, had it known the truth, it "would have refused to deal with [the other party] on general principles." Id. at 1218 (emphasis added). There must be a showing that the defendant intended to cause economic harm.

21

If our understanding of this Court's cases is correct, then the trial court's jury instruction was wrong. We say that because the instructions would permit the conviction of the broker in our hypothetical. After all, he deprived the insurance companies of their "ability to make an informed economic decision about what to do with his property," which the court instructed was a deprivation of money and property. To be sure, the court added that there must be proof that, if the scheme succeeded, "there would be economic harm to the victim." But it then robbed that qualifying phrase of any force by saying that "economic harm is not limited to a loss on the company's bottom line." (One wonders on what other "line" the economic harm might appear.) Because nothing in those two sentences would preclude a jury from convicting a broker who did not intend economic harm, the charge misstated the law.

By the same token, the language that the scheme must "have created a discrepancy between what the insurance companies reasonably anticipated and what they actually received" did not save the charge from infirmity. As the court made clear at the Rule 29 argument, those words meant that "if the government [could] prove the victim[s] . . . thought they were bargaining for universal life, and they ended up getting STOLI, which they didn't want, that would be enough."

22

(A-811-12). But that is not enough, for it also permits a conviction without a

showing that Mr. Binday intended to cause economic harm.[16]

In his Report and Recommendation in United States v. Lebovits, 2012

WL 10181099 (E.D.N.Y.), a case much like this one, Magistrate Steven Gold

addressed this issue:

> As the [Second Circuit] explained in Shellef,
> misrepresentations by defendants "that do no more than
> cause their victims to enter into transactions they would
> otherwise avoid" do not, without more, violate the mail
> or wire fraud statutes. Shellef, 507 F.3d at 108. Thus, if
> the government's proof at trial establishes only that
> insurance companies would prefer not to issue large,
> multi-million dollar life insurance policies to lower
> middle class individuals who plan to sell those policies
> immediately after obtaining them and have no intention
> of paying the premiums on the policies themselves, and
> that the reasons for this preference on the part of
> insurance companies have nothing to do with the risks
> and rewards, profits and losses, or other terms of the
> bargain made when an insurer issues a life insurance
> policy, defendants may well be in a position to make a

---

[16]    The sentence in the charge that "[e]conomic harm is not limited to a loss on
the company's bottom line" confused two distinct concepts. If a person schemes to
defraud an insurance company (say by submitting false health information) and
uses the mail to further the scheme, it is a mail fraud, even if the scheme is
discovered before the insurance company is harmed. Mail fraud is an inchoate
crime. But to support a mail fraud conviction, the proof must show that the
defendant contemplated economic harm. See United States v. Rossomando,
144 F.3d 197, 202 (2d Cir. 1998)(an unclear "'no ultimate harm' instruction [can
create] a substantial risk that the jury [is] confused into believing that the
government [is] not required to prove that [the defendant] intended to harm the
[alleged victim]")(emphasis added).

> compelling motion for a judgment of acquittal at the
> close of the prosecution's case.

Id. at 7 (emphasis in original). To borrow Magistrate Gold's words, the charge here was flawed because it allowed a conviction where the insurance companies' aversion to STOLI had "nothing to do with the risks and rewards, profits and losses" of issuing the policies.

That the court's charge was designed to permit the conviction of a defendant who tricked insurance companies into issuing STOLI policies, earned commissions on the policies, but did not intend (or cause) economic harm is clear from the colloquy throughout the trial. As noted above, the government took the position that it was "alleging that there was a scheme to defraud to deprive insurance companies of . . . commissions they wouldn't have paid had they known the truth, deprive them of the policies they wouldn't have issued . . . had they known the truth." (A-819-20). And, at the charge conference, the court noted approvingly that "the government is going to argue that there was economic harm because [the defendants] received commissions." (A-834). But that is a right to control theory, which this Court has rejected. The mere fact that an insurance company would not have issued a policy had it known the truth does not make this a federal crime.[17]

---

[17]  The court seemed to believe that this was a "zero-sum game" in which the fact that the defendants gained (i.e., earned commissions) meant that the insurance

24

The government's sentencing submission also shows its mistaken belief that proof that Mr. Binday earned commissions was proof that the insurance companies suffered economic harm:

> Defendants assert that the Government's "theory of conviction" at trial was "limited to 'right to control.'" (Binday Mem. at 1). This distorts the record. The government maintaining . . . that deprivation of right to control economic decision-making was sufficient to convict . . . pointed to tangible deprivations of property on individual Scheme Policies to support its charges. <u>Among these were the millions of dollars in commissions the Insurers paid defendants under false pretenses, and the millions in death benefits defendants reaped in two cases (those of Doris Riviere and Hanni Lennard), at the expense of the Insurers, as a result of their fraud.</u>

Government's Reply in Support of its Sentencing Arguments at 3, n.2 (emphasis added).[18]  Surely, if the government believed that payment of commissions was enough to convict, then the jury could have as well.  <u>See also</u> A-1621 (the court: "[t]hey were deprived of the ability to make an informed decision about whether to

---

companies lost.  A-1627 ("the government rightly points out where there are winners, there also tends to be losers").  But that characterization misses the mark.  Consider another hypothetical.  X seeks to sell his apartment and tells Y, his broker (whom he is paying a 5 percent commission), that he wants no "foreign buyers."  Y finds Z to purchase the apartment, telling X that Z is native born when he is not.  X sells his apartment to Z at market price and pays Y a commission.  Y has economic gain, but X has no economic loss.  All that can be said is that X would not have sold to Z had he known the truth.

[18]  That the defendants purchased two policies and received the death benefits when the insureds died early is not an economic harm to the insurance company. The insurance business, after all, is premised on the fact that some insureds will die before their life expectancy and others will live beyond it.

deal with shysters . . . and to pay those individuals massive commissions in the millions of dollars").[19]

<center>* * *</center>

We have argued above that the court's charge was erroneous because it allowed a conviction on an invalid right to control theory. At best, the instruction was hopelessly confusing. It was a hodgepodge of conflicting statements that pointed in different directions and failed clearly to communicate the applicable law. No layman hearing it could know what was required to convict. That lack of clarity is reason enough to reverse Mr. Binday's conviction and order a new trial. Rossomando, 144 F.3d at 202 (even if a "skillful parsing of the court's charge [might reduce] the potential confusion," a conviction cannot

---

[19]    At the argument on bail pending appeal, the government repeated the theme that receiving commissions equals intending to cause economic harm:

> Judge Jacobs: . . . But the question is whether they intended to cause economic harm of a palpable kind that amounts to money in a nutshell.
>
> The government:  And they absolutely did.  And I want to make one point which I haven't touched on yet.  They also got commissions -- this is interference on a totally different plane -- and it stands alone.  These were agents who had sworn to serve these insurance companies and they were repeatedly certifying to the insurance companies that they were rendering services according to the policies that had been promulgated by the insurance companies.  They certified that these applications were truthful to the best of their knowledge.

Audio tape:  Bail Pending Appeal Argument (Oct. 7, 2014)(emphasis added).

<center>26</center>

stand where the charge is "too ambiguous and obscure to inspire confidence" that the jury understood the law's requirements). As this Court has recently reminded, "clear and adequate jury instructions are [especially] important when a criminal defendant's liberty is at stake." United States v. Kopstein, 2014 WL 3561750 (2d Cir.).

## POINT TWO

### THE EVIDENCE WAS LEGALLY INSUFFICIENT JUDGED AGAINST A CORRECT JURY INSTRUCTION

The law in this Circuit is settled that where a trial court has given an erroneous legal instruction, an appellate court should proceed to consider whether "the evidence was sufficient to convict [the defendant] under correct . . . instructions." United States v. Ford, 435 F.3d 204, 214 (2d Cir. 2006). Accord, United States v. Bruno, 661 F.3d 733, 742 (2d Cir. 2011)("sufficiency of the evidence review is appropriate when a conviction has been reversed for trial error"). That settled principle makes abundant sense, for if the evidence is legally insufficient, then a retrial is impermissible. See United States v. Wallach, 979 F.2d 912, 917 (2d Cir. 1992)("reversal of a conviction on grounds other than sufficiency does not avoid the need to determine the sufficiency of the evidence before a retrial may occur").

The sufficiency question here is this: could a reasonable juror have concluded that Mr. Binday intended to impose economic harm on the insurance

27

companies from which he obtained STOLI policies?  Mr. Binday's defense was that he had no such intent.  He believed that the insurance companies saw STOLI as unseemly (a hedge fund had an economic interest in an insured's early death) or perhaps illegal (an issue not resolved in New York until 2010) but not unprofitable.  To him, the economics of a STOLI policy were no different from those of a non-STOLI policy that an owner decided to sell soon <u>after</u> acquiring it.

Notably, the government called two insurance company witnesses to testify that STOLI policies caused economic harm to their companies, but <u>no</u> witness to testify that Mr. Binday contemplated such harm.  As noted above, the first of the two insurance company witnesses, James Avery, was a dud:  he testified that Prudential did not want STOLI business because it was illegal and unattractive, but that the company saw no "performance difference" between STOLI and non-STOLI policies.  Surely, the fact that Avery could not say that STOLI policies imposed economic harm on Prudential goes far to suggest that Mr. Binday did not contemplate such harm.[20]

Of course, Avery was not in a position to give direct evidence about Mr. Binday's intentions.  The two men never met.  But the government called four

---

[20]    The second insurance company witness, Michael Burns, testified that he believed STOLI policies affected profitability, but his testimony was pure <u>ipse dixit</u>; no statistics were offered to support his belief, and no investor was called to confirm his suspicions.

witnesses who were "insiders" to the alleged scheme: Tracey Robinson, Alexander Marec, Edward Lynch and Paul Krupit. None of the four testified to any conversation in which Mr. Binday indicated that he thought he might be exposing the insurance companies to economic harm. None testified that Mr. Binday ever mentioned lapse rates, minimum premium payments, grace periods or anything else that might support such an inference.

What the trial record does show is that the defendants took care that the medical information submitted to the insurance companies was accurate. No insured was ever asked to alter his medical history to make him appear healthier than he was. Paul Krupit, the lead cooperator, gave this testimony:

> Q. Was it fair to say that the medical information that you put down on behalf of your clients was always accurate?
>
> A. Yes.

(A-771); see also A-1528 ("[t]he government has never alleged that [the] defendants . . . misrepresented any straw insured's medical information").

That the medical information was accurate is especially significant. As everyone knows, to submit false medical records to a life insurance company is to defraud it. Such a misrepresentation allows one to obtain a policy on the cheap, and it strikes at the heart of the bargain. See, e.g., United States v. Lorefice, 192 F.3d 647, 649 (7th Cir. 1999)(defendant found "individuals who were critically ill

and thus likely to die soon and [falsely] list[ed] them as employees" on his company's group life insurance policy, designating himself and his daughters as beneficiaries).  By contrast, the notion that STOLI policies lapse less frequently than non-STOLI policies or that STOLI investors pay less premiums "up front" than non-STOLI policyholders is not common knowledge.  It is not something one would reasonably expect an insurance broker to know.[21]

Indeed, there is good reason to believe that the indictment's economic harm theory is bogus.  In evaluating the effect of STOLI policies on an insurance company's bottom line, the proper comparison, one would think, is not between STOLI policies and all non-STOLI policies, but between STOLI policies and non-STOLI policies issued to insureds over 70 with high death benefits (and high premiums).  An insured in her fifties may let a policy lapse when her children have graduated college.  But does a wealthy insured in his seventies who is buying life insurance for estate planning purposes allow a policy to lapse when he is paying $250,000 a year in premiums?  Does he pay more than the minimum premiums?  Put simply, the theory of economic harm advanced in the indictment is so speculative that a jury could not fairly conclude that Mr. Binday had to have

---

[21]     Throughout the pre-trial process, the insurance companies fought to limit subpoenas so that their pricing models would not become public.  See Lincoln National Partial Motion to Quash Rule 17 Subpoenas at 5 (disclosing "sensitive pricing information" would "place Lincoln at a competitive disadvantage and impede its business").

known he was exposing the insurance companies to harm. Cf. United States v. Nkansah, 699 F.3d 743, 750 (2d Cir. 2012)(jury may infer that defendant intended to harm bank where bank's "exposure to losses is sufficiently well-known" but not where its exposure is "unclear, remote, or non-existent").

* * *

Michael Binday's business plan was to obtain life insurance policies with high death benefits for sale to investors who believed that there was an opportunity for an arbitrage profit. The investors were betting that the insureds would die sooner than the insurance companies were estimating.[22] Mr. Binday and his partners helped feed their demand. That meant submitting false net worth information to obtain policies with large death benefits. And it meant falsely reporting that the policies were not STOLI so as to get past insurance company screens, which were real or pretend. But the contention that Mr. Binday knew that he would be imposing economic harm on the insurance companies was unproven. Lapse rates, minimum premium payments, grace periods and the like had no place in his thinking. Viewed most favorably to the government, the evidence showed

[22] In many instances, the investors appear to have lost the bet. Reportedly, some of the actuarial companies on which the investors relied subsequently determined that their estimates were too low and adjusted them upwards to be "much closer to (and in many instances longer than)" insurance company estimates. (A-1450). The readjustment "reduced . . . the attractiveness of STOLI transactions." (Id.).

that Mr. Binday deceived the insurance companies into issuing STOLI policies, but that he had <u>no</u> intent to defraud them.  <u>See</u> <u>United States v. Lorenzo</u>, 534 F.3d 153, 159 (2d Cir. 2008)("[i]f the evidence . . . gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt").

<div align="center">

**POINT THREE**

**<u>THE INDICTMENT WAS CONSTRUCTIVELY AMENDED</u>**

</div>

As this Court has observed, "[w]hen the trial evidence or the jury charge operates to 'broaden[] the possible bases for conviction from that which appeared in the indictment,' the indictment has been constructively amended." <u>United States v. Milstein</u>, 401 F.3d 53, 65 (2d Cir. 2005), <u>quoting</u> <u>United States v. Miller</u>, 471 U.S. 130, 138 (1985).  "[A] [c]onstructive amendment is a <u>per se</u> violation of the Fifth Amendment."  <u>Id.</u>; <u>see also</u> <u>United States v. Clemente</u>, 22 F.3d 477, 482 (2d Cir. 1994)("[u]nder the fifth amendment, a defendant has the right to be tried only on charges contained in an indictment returned by a grand jury").  Because such a broadening occurred here, a new trial is warranted.

A.    <u>Background</u>

As discussed in Point One, the Indictment set forth the theory that the insurance companies had been "financially harmed in issuing [STOLI] policies." Ind. ¶ 4.  Paragraph 10 identified four specific harms:  (i) the wealth equals health effect; (ii) premium funding "at or near the minimum level necessary to sustain the

policy"; (iii) lower lapse rates; and (iv) greater use of grace periods. Anyone reading the indictment would conclude that the list was meant to be exclusive. Indeed, the familiar phrase "among other ways" was not mentioned. Compare United States v. Rigas, 490 F.3d 208, 226-29 (2d Cir. 2007)(use of "among other things" language supported "government's argument that there was no constructive amendment [because] the specific allegations of bank fraud [were] merely exemplary").

Prior to trial, the court issued an opinion that underscored that the Paragraph 10 harms were at the core of the case, but which began the process of broadening. The court wrote that "the Government cannot prevail if it does not introduce evidence that the Insurers suffered, for example, the harms outlined at Paragraph 19 [sic]." A-254 (emphasis added). The phrase "for example" opened the door to the possibility that other harms could be proven to support a conviction.

The broadening became more apparent at the Rule 29 argument when the government's proof was complete. There was this colloquy:

> [Defense Counsel]: [Y]our Honor had told the government they should prove the harms in the indictment, they didn't come near proving the harms in the indictment.
>
> THE COURT: . . . . They don't have to prove the ones alleged in the indictment. What I said was if they proved those, that would be sufficient.

33

(A-815).[23]

Notably, during the Rule 29 argument, the prosecutor identified several non-Paragraph-10 harms that the insurance companies allegedly had suffered:

> [W]hat we are alleging is that there was a scheme to defraud insurance companies of money and property, deprive them of commissions, they wouldn't have paid these commissions had they known the truth, deprive them of the policies they wouldn't have issued and the costs they wouldn't have incurred had they known the truth. Yes, it also deprived them of their right to control their economic decision-making . . . . [T]he executives who took the stand and testified about the harms they foresaw with STOLI, they talked about reduced profitability, they talked about tax consequences, they talked about higher prices resulting from having to get reinsurers' approval . . . . They incurred massive economic costs, not quantifiable necessarily, they described as soft costs, to try to limit STOLI, to try to stamp it out.

(A-819-20). And, of course, the court's instructions did not mention Paragraph 10 harms and instead told the jury that the concept of "economic harm" was not "limited to a loss to the company's bottom line."

---

[23] The court's opinion followed oral argument at which the government objected to the claim that it had "changed course here." (A-263). It told the court that it was "adhering to the allegations of the indictment [which] allege[] financial harm." Id. at A-264.

34

B.     Discussion

Plainly, the charges were broadened from ones requiring proof of the four specific economic harms (the Paragraph 10 harms) to ones requiring proof of <u>any</u> economic harm, even harm that would not have resulted in a loss to the insurance companies' "bottom line."  Any "economic harm" would do:  having to pay commissions, depriving the insurance companies of policies that they wouldn't have issued had they known the truth, forcing them to incur the "soft costs" associated with trying to "stamp [STOLI] out," or jeopardizing the favorable tax treatment that life insurance receives.  Because of this broadening, it cannot be said that "the defendant was convicted of conduct that was the subject of the grand jury's indictment," <u>United States v. Salmonese</u>, 352 F.3d 608, 620 (2d Cir. 2003), and therefore a constructive amendment occurred.

The switch in theories was understandable because the government's proof that STOLI caused Paragraph 10 harms was exceedingly weak.  But the fact that the switch was understandable does not make it permissible.  This Court's decision in <u>United States v. Milstein</u>, 401 F.3d 53 (2d Cir. 2005) is closely on point.  There, the indictment charged Milstein "with misbranding due to his repackaging of [certain] drugs," but the court instructed the jury that it could find Milstein guilty if the drugs were "misbranded because they were not sterile."  <u>Id.</u> at 65.  This "contamination allegation" (as distinct from the repackaging allegation)

35

was not mentioned in the indictment and marked a switch in the prosecution's theory. On this record, this Court reversed Milstein's conviction. It noted that "this [was] precisely the type of [error] against which the Supreme Court had cautioned" in the seminal case of Stirone v. United States, 361 U.S. 212 (1960), where the Supreme Court wrote this:

> The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without court amendment. Here . . . we cannot know whether the grand jury would have included in its indictment a charge that commerce in steel from a nonexistent steel mill had been interfered with. Yet . . . this might have been the basis upon which the trial jury convicted petitioner. If so, he was convicted on a charge the grand jury never made against him.

Id. at 218-19. Because the very same can be said here, the indictment was constructively amended.

From the bail pending appeal argument, it seems certain that the government will respond that Mr. Binday was not prejudiced because he had ample notice of the government's change of theory. To be sure, prior to trial, defense counsel saw that the government was switching theories and cried foul. See supra at 16-17. But where there has been a constructive amendment, it is no answer that the defendant was on notice that the basis for conviction had been broadened. The Fifth Amendment error is the broadening. See Stirone v. United States, 361 U.S. at 218.

**POINT FOUR**

**THE PROSECUTOR'S SUMMATION**
**ARGUMENT PREJUDICED THE DEFENSE**

As is now clear, a central issue at trial was whether the insurance companies had suffered economic harm (or more precisely whether Mr. Binday had contemplated such harm). In its rebuttal summation, the lead prosecutor sought to shore up the government's case by advancing a theory of economic harm that distorted the facts. The error was so egregious that it requires reversal of Mr. Binday's conviction. See United States v. Richter, 826 F.2d 206, 209 (2d Cir. 1987)("the prosecutor in a criminal case has a special duty not to mislead").

Although the Indictment alleged harm by pointing to lapse rates, premiums paid, and use of grace periods, the lead prosecutor, in his rebuttal summation, took a different tack. He put a chart on the screen that was part of GX 1408 and argued this:

> If you look at this exhibit in 1408, you see Oswalt Heaton is clearly 80 years' old. And let's just look at this one example. You see this is a $4 million policy if you look at the death benefit. And if you look at the net, if you look at the premiums, 2.3 million, 2.2 million, 2 million . . . . Yes, the insurance company gets premiums, they get about $2 million in premiums. But for what, ladies and gentlemen? For the opportunity to pay $4 million when that insured dies. That's not good business. It's not good business. If every policy behaved like this . . . $2 million for $4 million in return, insurance companies would not and could not exist . . . . But according to the defendants, the insurance companies

37

wanted this business.  They wanted this business where they take in about half of the death benefits they're actually going to pay out.  Ladies and gentlemen, no one can say that that is good for business.

(A-875-76)(emphasis added).[24]

If ever a summation argument was flawed, it was this one.  Mr. Binday prepared the chart at issue for potential purchasers of a policy to be issued to Ossie Heaton, age 80.  What the chart shows is that two actuarial companies -- 21st Underwriters and AVS -- had evaluated Mr. Heaton's health information and concluded that he was likely to live 10 years more.  (21st Underwriters estimated his longevity at 130 months, and AVS at 111 months, for an average of 10.04

---

[24]     The relevant portion of the chart looks like this:

### Ossie Heaton
### DOB:  09/06/1927; Age 80

| LE Reports | (months) | Date of Report |
|---|---|---|
| 21st | 130 | 7/31/2007 |
| AVS | 111 | 7/20/2007 |
| Average | 120.5 | 10.04 |

### Lincoln Life

| Product | LifeElements | | LifeGuarantee Plus | | LifeCurrent | |
|---|---|---|---|---|---|---|
| TARGET PREMIUM | $259,416 | | $224,040 | | $236,520 | |
| Underwriting | Preferred | | Preferred | | Preferred | |
| Scenario | TML | | TML | | TML | |
| (end of year) | Premium | Death Benefit | Premium | Death Benefit | Premium | Death Benefit |
| 1      73 | $259,416 | $4,000,000 | $224,040 | $4,000,000 | $236,520 | $4,000,000 |
| 2      74 | $107,677 | $4,000,000 | $113,450 | $4,000,000 | $165,000 | $4,000,000 |
| 3      75 | $252,850 | $4,000,000 | $234,430 | $4,000,000 | $206,800 | $4,000,000 |
| 100+ | | END @ 100 | | END @ 100 | | END @ 100 |
| Premiums to LE | $2,389,893 | | $2,212,930 | | $2,055,920 | |

The full chart can be found in the Appendix at A-1170.

years.)  The total of his expected premium payments over a 10 year period was between $2,389,893 and $2,055,920 depending upon the policy that was chosen (e.g., $236,520 + $165,000 + (8 x $206,800) = $2,055,920).  The death benefit was $4 million.

The chart does <u>not</u> show that the insurance company stood to lose $2 million on the policy, as the prosecutor wrongly claimed.  A-876 ("$2 million for $4 million in return").  As defense counsel told the court when he objected to the summation argument, the prosecutor's calculus ignored the fact that an insurance company does not put premiums under a mattress; it invests them.  <u>See</u> A-1477 ("as both Avery and Burns . . . acknowledged after the receipt of the first premium, each and every premium received thereafter is invested by the insurance company and [it] recovered a rate of return on that investment").[25]

---

[25]    Defense counsel did not object to the rebuttal summation when it was given, but sent a letter to the court that night.  The letter requested a mistrial or, at a minimum, the following instruction:

> In its rebuttal summation, the Government argued that the insurance companies would lose money if they had to pay death benefits based just on the amount of the premiums the insurance companies received.  In making this argument, the government failed to mention evidence in the record that insurance companies invest the life insurance premiums they receive and make returns on those investments.  Among other things, you can consider the fact that the insurance companies receive investment returns in determining whether the insurance

Even that is not the full story. What the prosecutor also did not tell the jury is that the insurance company believed that Mr. Heaton would live longer than 10 years. That was the arbitrage opportunity that the hedge funds had identified and were seeking to exploit. (A-484-85)("they were betting against the house"). If the hedge funds bet wrong and the insurance company's estimate was correct, then for each year that Mr. Heaton lived beyond 10, the insurance company received another $200,000 in premiums, which could be invested.

Plainly, it is difficult to imagine a more misleading summation comment on a more central issue than the prosecutor's "$2-million-for-$4-million-in-return" argument. It gave the jury a false reason to conclude that the insurance companies would lose money on STOLI policies. Moreover, it suggested that Mr. Binday had contemplated such a loss, thereby filling the gap in the government's proof. After all, the chart the prosecutor distorted was one Mr. Binday authored. And, by leaving the prosecutor's argument uncorrected, the trial judge conveyed the implicit message that it provided a sound basis for conviction. United States v. Modica, 663 F.2d 1173, 1181 (2d Cir.1981)(a reviewing court should consider "the measures adopted to cure the misconduct" in assessing prejudice). In short, the prosecutor distorted GX 1408, and, with it, the trial.

---

companies suffered economic harm as I will define that term for you in the jury charge.

A-1477. The court denied the request. (A-882-83).

We recognize that a defendant who seeks a new trial on the basis of a summation error "bears a substantial burden." United States v. Millar, 79 F.3d 338, 343 (2d Cir. 1996). But what occurred here was not "a legitimate rejoinder," id., a "rhetorical flourish," United States v. Williams, 690 F.3d 70, 76 (2d Cir. 2012), or a bit of "improper vouching." United States v. Nersesian, 824 F.2d 1294, 1328 (2d Cir. 1987). As this Court has written, "[t]he prosecution and the defense are generally entitled to wide latitude during closing arguments, so long as they do not misstate the evidence." United States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998)(emphasis added); see also United States v. Suarez, 588 F.2d 352, 354 (2d Cir. 1978)(counsel may not "refer to 'facts' that are not in the record, misstate the evidence or . . . substitute his own opinions on summation in lieu of expert testimony").

Closely on point is United States v. Forlorma, 94 F.3d 91 (2d Cir. 1996). There, the defendant was arrested at JFK Airport when custom agents found four kilograms of heroin concealed in a false side of one of four bags that he was carrying. At trial, the defendant testified that the bag did not belong to him. On summation, the prosecutor argued that the defendant's ownership of the suitcase was shown by the fact that it contained suits that fit him. As the prosecutor should have known, however, the contents of the four bags had been commingled, so the fact that the suits fit the defendant proved nothing. See id. at

41

95 ("there was no basis for the argument that the heroin suitcase had contained the defendant's personal belongings"). On this record, this Court reversed the defendant's conviction:

> [T]he prejudicial effect on the jury of a misleading argument is equally great regardless whether the attorney knows it to be baseless . . . . This was not an instance of a trivial misstatement that was likely to pass unnoticed . . . . [T]he misstatements related to the most important issue at trial . . . . Since knowledge of the heroin in the bag was the only issue Forlorma contested at trial, the prosecutor's statement to the jury that suits fitting Forlorma were in the bag with the heroin when he was arrested was likely to be devastating to his defense.

Id. at 95-96. Here, too, the misstatement related to a central issue at trial and was devastating to the defense. A new trial should therefore be ordered.

## POINT FIVE

### THE "LOSS AMOUNT" FOR PURPOSES OF SENTENCING AND THE RESTITUTION AWARD WERE WILDLY OVERSTATED

The court sentenced Michael Binday to 12 years' imprisonment, saying that his was a "significant economic crime[] [that required] a significant period of time." (A-1625). In doing so, the court accepted the government's estimate that Mr. Binday had "caused actual losses of $38,153,631." (Id. at

A-1601).  That figure is so wildly overstated that, if Mr. Binday's convictions are not reversed, a remand for resentencing is required.[26]

To reach the $38,153,631 loss figure, the court adopted the government's formula:  "total commissions paid to [the defendants] on [the] 74 [STOLI] applications . . . [plus] total death benefits paid on th[e] [settled] policies . . . less the premiums actually paid on those [settled] policies [and less] the premiums on lapsed policies which . . . are found money for any insurance company."  (A-1621-22).[27]  This formula is plainly wrong.  It includes those policies where the insured had died early (prior to sentencing) but ignores those policies that remain in force and where the insured may die at her expected age or later.  It is akin to looking at the financial health of a fire insurance company by considering only those homes that caught fire.[28]

A simple example helps underscore the point.  Assume the CEO of a life insurance company does not want to sell insurance to people living in

---

[26]  The loss amount informed the court's restitution order, which was for $39,308,305.63:  $38,153,631 (the loss amount) + $1,154,674.63 in attorneys' fees, costs and allowable interest incurred by the insurance companies.  See A-1581.  There is also a forfeiture order imposing a money judgment in the amount of $13,522,424.64, which represents Mr. Binday's gross commissions and the death benefits for the two policies he purchased.

[27]  Although the government argued at trial that STOLI policies would not lapse, it reported prior to sentencing that many had.

[28]  The calculation also continues to ignore the fact that insurance companies invest the premiums that they receive.

43

Minnesota because he had a bad experience there.  D, a broker, obtains policies for two Minnesota insureds, A and B, by falsely reporting that they live in New York.  Each policy has a $1 million death benefit; each requires a $100,000 annual premium; the life expectancy of each insured is 12 years; D's commission is the first year premium ($100,000); and, to make the calculation easy, the interest rate is 0 percent.  At the time of sentencing for this "crime," A is dead (he lived only 6 years) and B is thriving (she will live 18 years).  What is the loss to the insurance company on these facts?

For the government, the answer is $600,000 (A's $1 million death benefit - A's $600,000 in premiums + D's $200,000 in commissions on A and B's policies).  But that cannot be right.  If B lives 18 years so that A and B on average live 12 years, there will be <u>no</u> loss; indeed, there will be a $200,000 gain.  The insurance company will have earned $2.4 million in premiums ($600,000 + $1.8 million) and paid out $2.2 million ($2 million in death benefits and $200,000 in commissions).  Stopping the clock at the time of sentencing, which is what the government's methodology does, ignores what insurance is about.

Another way to make the point is to quote the trial testimony of James Avery, the President of Prudential Insurance Company of America:

> You have the individual who pays one premium and dies six months later.  You lose a lot of money on that policy <u>but we don't consider that a loss</u> . . . .  [T]hat's the benefit of insurance because there's another 900 people

44

who paid a premium who didn't die . . . .  [There are]
unfortunate legitimate deaths. . . .  That's what insurance
is there for.

(A-486-87)(emphasis added).  The government, it seems, proffered Mr. Avery's

testimony but did not listen to it.[29]

\* \* \*

This case started with an indictment that identified four specific

economic "harms" that the insurance companies allegedly suffered because of Mr.

Binday's deceit:    supposed differences between STOLI and non-STOLI

policyholders in lapse rates, premium payments, and use of grace periods, and the

wealth equals health effect.  At sentencing, however, those harms disappeared.  No

effort was made to demonstrate that the insurance companies suffered losses on the

basis of those harms, because, most likely, they never did.  In place of those harms

was a formula that any insurance expert would find laughable.  The shift from four

unproven harms to a bogus loss formula encapsulates the history of this case.

---

[29]    If the loss amount is overstated, then the restitution award is as well.  <u>See</u>
<u>supra</u> at 43 n.26.

## CONCLUSION

That Michael Binday's conduct was less than estimable is difficult to dispute. He deceived insurance companies into issuing STOLI policies to hedge fund investors who believed that the companies' life expectancy assumptions were wrong and therefore that a profitable arbitrage opportunity existed. He fed the investors' demand. But that is not enough to support mail and wire fraud convictions. A federal fraud conviction requires proof that a defendant intended to cause economic harm, and there was no such showing here. There was no intended economic harm and no proven economic harm, and yet Mr. Binday faces 12 years in prison. For the reasons stated above, his convictions and sentence cannot stand.

Dated:    New York, New York
          December 9, 2014

                                        Respectfully submitted,

                                        ZUCKERMAN SPAEDER LLP


                                        By: s/Paul Shechtman
                                            Paul Shechtman
                                            1185 Avenue of the Americas
                                            New York, NY  10036
                                            212-704-9600

                                        Attorney for Defendant-Appellant
                                          Michael Binday

46

**CERTIFICATE OF COMPLIANCE WITH F.R.A.P. RULE 32(a)**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B). It contains 11,368 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman 14 point font.

Dated:  December 9, 2014